# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**GUILLERMINA LOPEZ,**

**Plaintiff,**

v.                                        Case No: 6:22-cv-1580-PGB-LHP

**EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC.,**

**Defendant.**
_____/

## ORDER

This cause comes before the Court on Defendant Embry-Riddle Aeronautical University, Inc.'s Motion to Dismiss (Doc. 23, the "**Motion**")), Plaintiff Guillermina Lopez's response in opposition (Doc. 31), and Defendant's reply thereto (Doc. 41). Upon consideration, the Motion is due to be denied.

## I.     BACKGROUND[1]

This putative class action stems from alleged fiduciary duty violations with respect to a company's employee retirement plan governed by the Employee Retirement Income Security Act of 1974 ("**ERISA**"). Specifically, Plaintiff Guillermina Lopez ("**Plaintiff**") is an employee and current participant of

---

[1] This account of the facts comes from the Plaintiffs' Amended Complaint. (Doc. 1). The Court accepts the well-pled factual allegations therein as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007). The Court will highlight, however, where the force of some of these claims is weakened by other documents properly under consideration at the motion to dismiss stage.

Defendant Embry-Riddle Aeronautical University, Inc.'s ("**Defendant**") qualified retirement Plan (the "**Plan**") for which he is eligible under 26 U.S.C. § 403(b). (Doc. 1, ¶ 1). Plaintiff has an individual account in the Plan. (*Id.* ¶ 17). He has invested in at least one of the funds he alleges was imprudently managed. (*Id.* ¶ 24). Defendant is a private, for-profit, nonsectarian university located in Daytona Beach, Florida. (*Id.* ¶ 27). The Plan has over 4,500 participants and, as of December 31, 2020, had nearly $500 million in assets. (*Id.* ¶¶ 7, 27).

> Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits. When Congress enacted ERISA it wanted to make sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it. Accordingly, ERISA tries to make as certain as possible that pension fund assets will be adequate to meet expected benefits payments.

*Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Defendant's Plan is a defined contribution plan, meaning that "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015); (*Id.* ¶ 2).

To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other fiduciaries of a given plan. (*Id.* ¶ 4); 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweeda v. Univ. of Pennsylvania*, 923 F.3d 320, 333

(3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries" and with the "care, skill, prudence and diligence" that would be expected in managing a plan of similar scope. *Id.*; 29 U.S.C. § 1104(a)(1). Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can reduce the amount of benefits available to a retiring employee. (Doc. 1, ¶ 5). Plaintiff claims that, according to data from the U.S. Department of Labor, even just 1% higher fees over the course of 35 years can result in a difference of as high as 28% in assets at the end of a participant's career. (*Id.* ¶ 6).

Like other Plan members, Plaintiff maintains an individual investment account funded by her pre-tax contributions from her salary and whatever matching contribution her employer provided, if any. (*Id.* ¶ 28). All Plan members choose how to invest their funds among, and only among, the menu of options that Defendant has selected. (*Id.*). The performance of chosen investments, as well as the deduction of any associated fees, determines the amount of money that the participant will be entitled to in retirement savings from the Plan. (*Id.* ¶ 29). Defendant has complete discretionary authority to control the Plan, including the selection and compensation for the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for investing. (*Id.* ¶ 30).

Plaintiff alleges that Defendant wrongfully chose poorly performing investments and inappropriate high-cost mutual fund share classes, causing the

Plan to pay unreasonably and needlessly excessive fees for certain services despite its ability to avoid doing so. (*Id*. ¶ 7). Plaintiff further alleges that any attempt that Defendant did make to reduce the Plan's expenses or oversee the Plan's investments was insufficient and in violation of the fiduciary duties it owed to its beneficiaries. (*Id*. ¶¶ 8, 9). Namely, Defendant employed flawed and ineffective investment processes that failed to ensure that Plan participants were charged reasonable fees and offered prudent investment options. (*Id*.).

Plaintiff alleges that through these actions Defendant did not meet the "prudent person" standard imposed under ERISA law: this duty, in part, requires a fiduciary continually to "monitor [plan] investments and remove imprudent ones" that exist in a plan. *Tibble*, 575 U.S. 523; (*Id*. ¶ 47). Plaintiff alleges that Defendant did not sufficiently monitor the Plan's ongoing investments, resulting in investment options that were more expensive than necessary and otherwise not economically justifiable. (*Id*. ¶ 49). According to Plaintiff, it can be reasonably inferred that Defendant's system of review was lacking: Defendants did not actively ensure that participants were being charged appropriate and reasonable fees for each of the Plan's investment options. (*Id*. ¶ 50). Defendants also failed to leverage the size of the Plan to negotiate the lowest expense ratio available for certain investment options maintained and/or added to the Plan during the Class Period. (*Id*.).

Part of Defendant's duty to evaluate and monitor fees and costs of the Plan includes overseeing the fees that participants themselves must pay to investment

providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. (*Id.* ¶ 57). Third-party financial research services exist precisely to afford relevant information to help plans similar to Defendant's Plan safeguard against excessive fees. (*Id.* ¶ 58). Plaintiff claims that Defendant failed to monitor the Plan prudently enough to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are purportedly identical to the mutual funds in the Plan in every way except for their lower cost. (*Id.* ¶ 62). In other words, the Plan did not receive any additional benefits because of the more expensive share classes it selected, resulting only in needless expenditures. (*Id.* ¶ 70). Plaintiff offers a non-exhaustive illustration of expensive share classes offered by the Plan during the Class Period as well as the correlating lower-cost share classes for the same fund:

| Share Class Comparisons (*Id.* ¶ 64) | | | |
|---|---|---|---|
| **Plan Fund** | **Expense Ratio("ER")** | **Lower Cost Share Class of Same Fund** | **Net Ratio Expense** |
| MFS International New Discovery Fund R4 MIDJX | 1.04% | MFS International New Discovery Fund R6 MIDLX | 0.91% |
| T. Rowe Price Blue Chip Growth Fund Retail TBCRX | 0.68 % | T. Rowe Price Blue Chip Growth Fund I TBCIX | 0.56% |
| JPMorgan Mid Cap Growth Fund Select HLGEX | 0.93 % | JPMorgan Mid Cap Growth R6 JMGMX | 0.70% |
| MFS Mid Cap Value Fund R4 MVCJX | 1.130 % | Victory RS Small Cap Growth R6 RSEJX | 1.04% |
| CREF Bond Market Share Class R2 QCBMPX | 0.28 % | CREF Bond Market Share Class R2 QCBMIX | 0.22% |
| CREF Equity Index Share Class R2 QCEQPX | 0.22% | CREF Equity Index Share Class R3 QCEQIX | 0.16% |
| CREFGlobal Equities Share Class R2 QCGLPX | .28% | CREFGlobal Equities Share Class R3 QCGLIX | .22% |
| CREF Inflation-Linked Bond Share Class R2 QCILPX | .23% | CREF Inflation-Linked Bond Share Class R3 QCILIX | .17% |
| CREF Money Market Share Class R2 QCMMPX | .24% | CREF Money Market Share Class R3 QCMMIX | .18% |

| CREF Stock Share Class R2 QCSTPX | .29% | CREF Stock Share Class R3 QCSTIX | .23% |
|---|---|---|---|

Using the comparisons in the table above as examples, Plaintiff alleges that Defendant should have known of the existence and availability of lower-cost share classes and thus should have acted accordingly—but failed—to save its Plan members money on less expensive share classes for which Defendant was qualified. (*Id.* ¶¶ 66, 67). Plaintiff alleges that Defendant's failure to uphold its fiduciary duties resulted in millions of dollars in losses during the Class Period. (*Id.* ¶ 72).

Specifically, Plaintiff alleges that Defendant failed to analyze the Plan's investment options regularly enough to determine whether its actively managed funds would outperform other options, which is evidenced by the duplication of funds offered throughout the Plan. (*Id.* ¶¶ 74, 75). Plaintiff similarly alleges that Defendant should have adopted prudent processes to place funds on watchlists and to ensure that funds were appropriately removed if doing so would have been beneficial for the financial health of the Plan. (*Id.* ¶ 76).

Defendant's monitoring of the Plan's recordkeeping and administrative expenses also presumably violated its fiduciary duties. (*Id.*). In the ERISA world, the term "recordkeeping" is seen as a catchall term for the suite of administrative services that a given plan's recordkeeper provides. (*Id.* ¶ 77). Recordkeepers commonly provide a broad range of services to a plan as part of a package. (*Id.*). Examples of such services can include claims processing, trustee services,

participant education, managed account services, and participant loan processing, among others. (*Id.*). These services are virtually universally offered among recordkeepers; defined contribution plans can customize their package of received services based on price. (*Id.*). Most recordkeepers charge plans on a per-participant basis. (*Id.* ¶ 80). Plans can pay recordkeepers in one of two ways (or a combination therein): they can either be paid directly from plan assets or indirectly from the plan's investments in a practice known as revenue sharing. (*Id.* ¶ 81). Plaintiff does not claim that Defendant's use of revenue sharing is on its face or *per se* imprudent. (*Id.* ¶ 82).

Plaintiff claims that prudent fiduciaries implement three relevant processes to manage and control a plan's recordkeeping costs prudently and effectively. (*Id.* ¶ 86). First, fiduciaries must closely monitor the recordkeeping fees being paid by the Plan by assessing the appropriate context at hand. (*Id.*). Second, a fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeping company, to ensure that the recordkeeper's total compensation from all sources remains reasonable so as not to deprive plan members of funds. (*Id.* ¶ 87). Third, a plan's fiduciaries must remain informed about overall trends in the marketplace concerning other similarly situated plans' fee structures, which generally entails requesting specific, relevant information every few years or as needed based on the individual circumstances of the given plan. (*Id.* ¶ 88).

Defendant failed to take all three of the aforementioned actions when tending to the Plan. (*Id.* ¶ 89). To substantiate his claims, Plaintiff points to the direct recordkeeping compensation paid by the Plan as compared to that of other plans during the relevant Class Period. (*Id.* ¶ 90). The Plan's per-participant compensation from 2015-2020 was as follows for recordkeeper TIAA's funds within the Plan: 1) 2015 - $62.46; 2) 2016 - $66.14; 3) 2017 - $76.40; 4) 2018 - $81.48; 5) 2019 - $76.44; and 6) 2020 - $78.52. (*Id.*). Plaintiff alleges that this increase in fees per year demonstrates unreasonably excessive payments. (*Id.* ¶ 94). Plaintiff further alleges that, generally, as plans increase in the size, the costs of recordkeeping generally decrease on a per-participant basis; yet the opposite has occurred in this case. (*Id.*). Plaintiff additionally points to several plans with tens of thousands of participants and billions of dollars in assets as follows:

| Recordkeeping Cost Comparisons (*Id.* ¶ 96) | | | | | |
|---|---|---|---|---|---|
| Name of Plan | # of Participants | Value of Plan Assets | Total Reported Recordkeeping and Administrative Service Costs | Costs Per Participant | Record keeper |
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | $25 | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | $27 | Vanguard |
| JPMorgan Mid Cap Growth Fund Select HLGEX | 46,943 | $3,793,834,091 | $1,526,401 | $33 | Fidelity |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 | Alight |

Using these funds as context, Plaintiff asserts that Defendant's Plan should have cost less to manage because of its much smaller size. (*Id.* ¶ 97). In particular, Plaintiff claims that Defendant should have similarly been able to keep the per-participant recordkeeping cost at somewhere between $25 and $30 but failed to do so. (*Id.*). Rather, at the time of filing, the total amount of recordkeeping fees was at least $160 annually per participant, more than four times the amount of the various competitors' annual fees per participant. (*Id.* ¶ 101). Due to the size of the Plan, Defendant's failure to monitor these expenses over several years cost the beneficiaries of the Plan millions of dollars. (*Id.* ¶ 107).  In doing so, Defendant additionally breached its fiduciary duties to participants. (*Id.* ¶ 99).

Furthermore, Defendant purportedly agreed that its recordkeeper could keep all of the interest earned on Plan participant accounts while participant money was in the recordkeeper's clearing account as a form of indirect payment without maintaining an awareness of how much compensation was being collected in this amount. (*Id.*).

Prior to the instant suit, on July 19, 2022 Plaintiff sent Defendant an Administrative Exhaustion Demand Letter, which set forth Plaintiff's claims and included a request for relief on her own behalf as well as that of the putative Class. (*Id.* ¶ 32). Defendant notified Plaintiff that the Plan "does not provide a claim or appeal mechanism for the matters alleged in your July 19 letter, including the threatened fiduciary breach claims;" Plaintiff accordingly states that he has exhausted his and the putative Class's administrative remedies. (*Id.* ¶ 33).

Thereafter, Plaintiff filed this two-count putative class action seeking relief in Count I for Defendant's alleged breach of its fiduciary duty of prudence, (*id.* ¶¶ 110–14), and in Count II for Defendant's alleged failure to adequately monitor the fiduciaries they appointed causing loss to the Plan and thus to Plaintiff. (*Id.* ¶¶ 115– 20). Defendant now moves to dismiss the Complaint for failure to state a claim. (Doc. 23). After Plaintiff's response (Doc. 29) and Defendant's reply (Doc. 41), this matter is ripe for review.

## II.   STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the

plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Furthermore, in ruling on a motion to dismiss, "[a] court is generally limited to reviewing what is within the four corners of the complaint" and the attachments thereto which are undisputed and central to the claim. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002); *Austin v. Modern Woodman of Am.*, 275 F. App'x 925, 926 (11th Cir. 2008) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)). In addition, however, the court may consider documents central to a claim whose authenticity is not in dispute as well as matters that are subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (permitting courts to consider documents attached to a motion to dismiss without converting the motion into one for summary judgment, but only if the attached documents are central to the plaintiff's claims and undisputed); *see also* FED. R. EVID. 201 (stating that a court "may judicially notice a fact that is not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). That said, Courts exercise caution when taking

judicial notice because it is "a highly limited process" as it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

## VI.   DISCUSSION

A motion to dismiss in the ERISA context is an "important mechanism for weeding out meritless claims" because ERISA "represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424–25 (2014) (internal quotation marks and citations omitted); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (noting that "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times.").

The Supreme Court has recognized that Congress wanted to avoid creating "a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefits plans in the first

place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).  At the same time, because ERISA plaintiffs generally do not have "inside information" regarding the fiduciary's process, "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story"—just as with motions to dismiss in other areas of substantive law. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (citation omitted); *Hughes*, 142 S. Ct. at 742 (remanding and noting that the lower court must "reevaluate the allegations as a whole" and "in context" by considering whether the plaintiffs "have plausibly alleged a violation of the duty of prudence as articulated in *Tibble*, applying the pleading standard discussed in [*Iqbal*] and [*Twombly*]."); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer."). An ERISA claim is plausible when a complaint creates an inference of a flawed and subpar effort to ensure that a plan's costs are not excessively high. *Id.* at 594, 596. ERISA claims are often "fact intensive" matters that may be more likely to resolve the merits through relevant discovery. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Allegations concerning the context or lack thereof behind excessively expensive fees are, in particular, among those that courts have ruled require discovery. *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015) ("While Defendants claim that Plaintiffs have not alleged facts regarding why the amount of the

recordkeeping fees are excessive, the services provided, or how the fees charged to the Plan were excessive in light of those services, this court finds that those are the types of facts warranting discovery, and, therefore, dismissal at this stage is not appropriate.").[2]

ERISA's fiduciary duties are "derived from the common law of trusts." *Tibble v. Edison Int'l.*, 575 U.S. 523, 528 (2015). "Certain persons, including those who exercise any authority or control respecting management or disposition of [fund] assets, bear fiduciary responsibility to an ERISA fund." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003) (internal quotations omitted). "The responsibility attaching to fiduciary status has been described as 'the highest known to law.'" *Id.* (quoting *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997)). To state a claim for breach of fiduciary duty under ERISA "the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Allen*, 835 F.3d at 678 (quoting *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010)); *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007), *as amended* (Dec. 21, 2007) (laying out that a breach of fiduciary duty

---

[2]   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

has three elements: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan.").[3]

With respect to the second prong, ERISA imposes a duty of prudence, which includes a duty to monitor.[4] 29 U.S.C. § 1104(a)(1)(B); *Tibble*, 575 U.S. at 528–30 (noting a plaintiff may allege that a fiduciary breached his duty of prudence and "continuing duty to monitor . . . by failing to properly monitor investments and remove imprudent ones.").

Defendant raises several arguments that the Court finds necessary to address, the first of which implicates the issue of whether Plaintiff has standing to bring this case.

---

[3]   Defendants do not challenge their status as fiduciaries with respect to the Plan or that their actions may have caused a loss at this procedural stage, so the Court does not address these elements. (*See* Docs. 23, 41).

[4]   ERISA mandates that those who invest other people's retirement money must do so "with the care, skill, prudence, and diligence" that a reasonable professional in the area would use and "defra[y] reasonable expenses of administering the plan[.]" 29 U.S.C. §§ 1104(a)(1)(B), 1103(c)(1). A fiduciary must also "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A). In addition, a fiduciary can also breach his fiduciary duty if he participates knowingly in, conceals, enables, or has knowledge of another fiduciary's breach. *Id.* § 1105(a). Fiduciaries who breach their duties are personally liable to make good to the plan any losses resulting from each breach. *Id.* § 1109(a).

### A.      Standing

The parties dispute whether Plaintiff has standing to bring his claim on behalf of the putative class.[5] (Doc. 23, p. 11; Doc. 29, p. 12). Upon consideration of the facts alleged, the Court agrees with Plaintiff.

A party must have standing to sue in federal court. *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). "A plaintiff invoking federal jurisdiction bears the burden of establishing the "irreducible constitutional minimum" of standing by demonstrating (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)). The injury-in-fact requirement demands that a plaintiff must "show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* Even the smallest of financial injuries can be enough to establish Article III standing. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 22 (D.D.C. 2020).

In the context of ERISA claims, courts have held that a plaintiff can show standing "by alleging an injury to a plan's assets unrelated to specific funds, if plan participants are all assessed a portion of the injury." *See Boley v. Universal Health Servs., Inc.*, 498 F. Supp. 3d 715, 720 (E.D. Pa 2020); *see also Clark v. Duke Univ.*,

---

[5]    Because Plaintiff's failure to monitor claim is wholly derivative of his first claim, the Court need only conduct one standing analysis here. *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 137 (D. Mass. 2021).

No. 16-1044, 2018 WL 1801946, at *3 (M.D.N.C. Apr. 13, 2018); *Taylor v. United Techs. Corp.*, No. 06-1494, 2008 WL 2333120, at *3 (D. Conn. June 3, 2008) ("Because a retirement plan is an aggregation of its participants' individual accounts, any loss to the [p]lan causes a loss to the [p]lan participants. Thus, plaintiffs fulfill standing based on their allegation that defendants breached their fiduciary duties by making decisions resulting in impaired returns or unreasonable fee charges and expenses.") (quotations and citations omitted); *Cryer v. Franklin Templeton Res., Inc.*, No. C16-4265, 2017 WL 4023149, at *4 (N.D. Cal. July 26, 2017) ("[I]n determining constitutional standing, courts look not to individual funds but to the nature of the claims and allegations to determine whether the pleaded injury relates to the defendants' management of the [p]lan as a whole.") (citations and quotations omitted).

A plaintiff need not show that he invested in all of the funds implicated when he has invested in at least one related fund and alleged injury to the plan at large resulting in uniform loss to all plan members in order to allege standing. *Cassell v. Vanderbilt Univ.*, No. 16-cv-2086, 2018 WL 5264640, at *1 (M.D. Tenn. Oct. 23, 2018) (finding standing for plaintiffs to pursue all ERISA claims related to the plan at issue on behalf of the plan despite not personally investing in all of the challenged funds because fiduciaries allegedly failed to facilitate lower, reasonable fees because of an imprudent process that injured all participants).

Defendant argues that Plaintiff lacks standing to claim injury based on "excessive fees paid for a particular investment" or neglecting a lower-cost share

class without a showing that he invested in that particular option. (Doc. 23, pp. 11—12). Plaintiff, however, asserts that 29 U.S. C. § 1132(a)(2) affords him standing to sue derivatively as a participant of the Plan for multiple reasons. (Doc. 1, ¶ 20). Plaintiff claims that he is entitled to standing because he invested in least one fund within the Plan, and the Plan suffered injury at large, thus affecting Plan members uniformly and in the same ways. (*Id.* ¶¶ 21, 23).

A review of relevant precedent reveals the merits of Plaintiff's arguments here. The *Boley* court specifically addressed scenarios in which a given plan failed to upkeep appropriate recordkeeping fees at the expense of the plan's participants, resulting in a clear conferral of standing. 498 F. Supp. 3d at 420. Here, Plaintiff alleges both that he invested in at least one fund affected by Defendant's alleged imprudence and also that Defendant engaged in imprudent decision-making resulting in a breach of duty as evidenced by the needlessly high administrative fees. (Doc. 1, ¶¶ 21, 23, 24).

Defendant invokes *Singh v. Deloitte LLP*, 2023 WL 186679 (S.D.N.Y. Jan. 13, 2023) in support of its argument that Plaintiff lacks standing here. (Doc. 41, p. 3). In particular, Defendant argues that Plaintiff has only alleged an injury generally and failed to allege that he "invested in any of the funds that [he] alleges underperformed or had high expense ratios," which the *Singh* court found problematic as well. (*Id.* at p. 4); 2023 WL 186679, at *4. Defendant, however, overlooks several paragraphs in Plaintiff's Complaint dedicated to its standing claim, wherein Plaintiff alleges, among other claims, that "the Plaintiff has

standing as to Defendant's imprudent selection and retention of the TIAA and VALIC funds because the Plaintiff invested in at least one of the TIAA and VALIC funds." (Doc. 1, ¶¶ 17–26).

Like the *Cassel* court, this Court also finds that Plaintiff's allegations, taken as true, meet the bar for Article III standing: Plaintiff invested in a part of the Plan which, like all other parts and participants of the Plan, was subjected to overly high recordkeeping fees that affected the Plan as a whole and "affected all Plan participants in the same way." (Doc.1, ¶ 23);  2018 WL 5264640, at *1. Even if, as Defendant points out, the TIAA funds only comprised some, as opposed to all, of the available investment opportunities available, Plaintiff would still have pled an injury—albeit a smaller one—because recordkeeping fees for that fraction of the Plan would still have been needlessly high. (Doc. 18, p. 26). Whatever this number might come out to, the Court finds that it would surpass the minimal amount of financial harm necessary to engender standing. *Whitman-Walker Clinic, Inc.*, 485 F. Supp. 3d at 22.

In other words, Defendant dipped into the pockets of all participants here regardless of whether any of them had invested in the funds that cost the Plan overly high recordkeeping fees overall. If Defendant can show otherwise as discovery ensues, it is more than welcome to re-raise its argument at a later juncture.

The Court is further convinced by the litany of cases cited by Plaintiff wherein courts have held that ERISA plaintiffs may sue beyond their own injuries

on behalf of other plan members' injuries. *See e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009); (Doc. 29, p. 14). As is often the case with statutory interpretation, ERISA law will inevitably be interpreted differently throughout the nation's courts. This Court, however, sides with those that have granted standing in instances substantially similar to this one.

### B. Count I: The Investment Committee's Duty of Prudence

For the reasons below, the Court finds that Plaintiff has plausibly alleged that Defendant breached its duty of prudence to the members of the Plan.

ERISA fiduciaries are held to the "prudent man" standard of care, which requires fiduciaries to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. '[A] pure heart and an empty head are not enough.'" *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (alteration in original) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)). "In order to assess the prudence of the fiduciary's actions, they must be evaluated in terms of both procedural regularity and substantive reasonableness." *Allen*, 835 F.3d at 678 (citing *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 680 (7th Cir. 2014)). However, hindsight is potentially misleading, so the focus must be "on a fiduciary's conduct in arriving at [a] . . . decision." *Sweda*, 923 F.3d at 329 (alteration in

original) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). To that end, a court should ask "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [course of action]." *Id.* (quoting *Unisys*, 74 F.3d at 434). At the pleading stage, however, factual allegations do not have to "directly address[] the process by which the [p]lan was managed." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Instead, a plaintiff's allegations are sufficient if a court can reasonably infer that "the process was flawed." *Unisys*, 671 F.3d at 327 (quoting *Braden*, 588 F.3d at 596).[6] Pled correctly, certain allegations in the ERISA context will likely require discovery and generally should not be resolved at the motion to dismiss phase. *Santiago v. Miami*, No. 1:20-cv-21784, 2021 WL 1173164, at *4 (S.D. Fla. Mar. 1,

---

[6]   The Supreme Court recently discussed the ERISA fiduciary's duty of prudence in *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022).  There, the plaintiffs alleged that the defendants violated their duty of prudence by offering needlessly expensive investment options and failing to solicit quotes or competitive bids for recordkeeping services. *Id.* at 740. In the case's leadup,  the Seventh Circuit had held that the plaintiffs failed to state a claim because the plan offered a mix of low-cost index funds, including the types of funds the plaintiffs wanted;  because the plaintiffs' preferred type of investments were available, the Seventh Circuit reasoned, the plaintiffs could not complain about the flaws in the other options. *Id.* The Seventh Circuit further found that the amount of recordkeeping fees paid were within the participants' control, since "'plan participants had options to keep the expense ratios (and, therefore, recordkeeping expenses) low.'"  *Id.* at 742 (quoting *Divane v. Northwestern Univ.*, 953 F.3d 980, 991 (7th Cir. 2020)).

The Supreme Court rejected the Seventh Circuit's argument that the availability of plan options eliminated any concern that certain plan options were imprudent. *Id.* The Court explained that the Seventh Circuit's holding "is inconsistent with the context-specific inquiry that ERISA requires and fails to take into account respondents' **duty to monitor all plan investments and remove any imprudent ones**." *Id.* at 740 (citing *Tibble*, 575 U.S. at 530 (2015)) (emphasis added).  The Court remanded the case and noted that "[b]ecause the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Id.* at 742 (internal quotation marks, citations, and alterations omitted).

2021), *report and recommendation adopted*, No. 20-cv-21784, 2021 WL 1165441 (S.D. Fla. Mar. 26, 2021) (pointing out the "fact-intensive inquiries" necessary to resolve the parties' dispute around recordkeeping fees and refusing to take up such a dispute on a motion to dismiss).

A fiduciary is responsible for monitoring recordkeeping expenses reasonably. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). The total amount paid to the recordkeeper relative to the alternative possible amounts of payment that could be saved is what the fiduciary must consider continually regardless of the method implicated. *Id.*

Plaintiff argues that Defendant breached its duty of prudence in three material respects: that 1) Defendant selected and maintained investment options without considering the financial impact of their overly high cost as compared to other similar investments; 2) Defendant failed to investigate the availability of lower-cost share classes of certain mutual funds within the Plan; and 3) Defendant failed to monitor the excessive compensation paid for recordkeeping services. (Doc. 1, ¶ 112). As discussed below, the Court finds that Plaintiff has plausibly alleged at least two of these claims sufficiently to withstand Defendant's Motion.[7]

---

[7] The Court need not analyze the totality of Plaintiff's claims because it finds that Plaintiff has met his burden in pleading the aforementioned second and third allegations.

Defendant responds with several arguments which the Court considers. Defendant's first argument—that a showing of imprudence requires more than merely alleging that Defendant selected more expensive share classes when other low-cost shares were available—fails. (Doc. 23, pp. 12–13). In support of this claim, Defendant raises *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1196 (D. Colo. 2021). There, the Court noted that "[t]here is no doubt that this case is a close call" but ultimately concluded that the defendant had not breached its duty because defendant's fund was varied and because,"[w]hile it [was] true that many of the funds defendant offered in its Plan were more expensive than underperformed alternatives, this was not true of all of the Plan's offerings." *Id.* at *1201. While the facts of the case at bar are analogous in certain respects to those that the *Kurtz* court analyzed, they also differ in important ways as outlined below. Though it may be a "close call," this time in the other direction, the Court finds that it is too premature to dismiss the case at this stage absent additional fact-finding. *Id.*

For instance, Plaintiff cites convincing, relevant precedent along with the facts that he alleges—the combination of which helps him withstand Defendant's Motion. In particular, in addition to alleging the inappropriate selection of higher share classes, Plaintiff also claims that Defendant's recordkeeping service fees were, at the time of filing, "at least $160 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually." (Doc. 1, ¶ 101). Even if the Court were to take this allegation as somewhat hyperbolic, Plaintiff's allegation would still suggest that Defendant's fees were at least five

times higher per participant than they should have been. (*Id.*). Moreover, Plaintiffs allege that this discrepancy existed compared to other firms notwithstanding the Plan's smaller size, which should have presumably made it easier rather than more difficult to temper recordkeeping costs. (*Id.* ¶ 97). The Court also takes note of Plaintiff's allegation that the recordkeeping costs increased each year from 2015 to 2020, rising as much as about 20% for direct, per-participant costs during that time period, which demonstrates a greater likelihood that Defendant was not properly leveraging its size to the participants' financial advantage. (*Id.* ¶ 90). This trend contributes directly to Plaintiff's claim that Defendant did not regularly manage the Plan prudently. (*Id.* ¶ 47).

Plaintiff also alleges that Defendant permitted the recordkeeping company to keep all of the interest earned on Plan participant accounts while participant money was in the recordkeeper's clearing account as a form of indirect payment without any demonstrable awareness of how much money was being kept. (*Id.*).

Based on the requirements laid out by the *Tibble* court, the Court finds that, here, the totality of these concerns warrants additional fact-finding. *Hughes*, 142 S. Ct. at 742. Because the *Tibble* court made plain that Defendant was required to "systematic[ally] conside[r] all the investments of the trust at regular intervals," the Court finds that Plaintiffs have plausibly alleged a breach of the duty of prudence. 575 U.S. at 529 (citation omitted). For purposes of the instant Motion, it is important to consider that a standard of plausibility does not equate to a standard of definitiveness. Certain information would likely assist the Court in

determining whether Defendant more likely breached its duty. What was the rationale, if any, behind allowing recordkeepers to keep the interest as a form of payment? How closely, if at all, was this portion of payment monitored? Were there justifications for particularly high recordkeeping expenses relative to market practices? Communications that suggest as much? Were the Plan participants kept apprised routinely of the reasons for these fees as they changed from year to year? Was there even an awareness that these fees were allegedly too high? Is there expert testimony available that can dispel any notion of imprudence relative to what would be considered standard practices? The parties should engage in discovery to resolve these fact-intensive questions. Thus, the Court agrees with Plaintiff that Defendant's argument is not yet appropriate to consider at this phase. *See Cassell*, 285 F. Supp. 3d at 1064 ("The question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss."); *see also Santiago*, 2021 WL 1173164, at *4 (pointing out the "fact-intensive inquiries" necessary to resolve the parties' dispute around recordkeeping fees and refusing to take up such a dispute on a motion to dismiss).

Defendant also relies heavily on *Renfro v. Unisys Corp.*, 2010 WL 1688540, at *6 (E.D. Pa. Apr. 26, 2010), *aff'd*, 671 F.3d 314 (3d Cir. 2011) in arguing that it did not breach its duty of prudence. (Doc. 23, p. 23). In *Renfro*, the Court held that the ERISA plan "offered participants a number of investment options with varying fees, risks, and potential rewards" which "included commingled pools, indexed

funds, bond funds, funds representing various parts of the global economy, and a money market fund." *Id.* Further, the Court noted that "[t]he fees charged by these funds were disclosed to investors who could choose from among the investment options to create a portfolio tailored to meet their investment objectives" and were also made available to the public, which helped the expense ratios remain competitive. *Id.* Defendant leverages this case to compare the range of expense ratios available in the Plan to the range of the plan found in *Renfro*, arguing that the numbers are even more favorable to Defendant here. (Doc. 23, p. 22).

Defendant's argument is not sufficiently compelling: even if Defendant is correct that its Plan offered a satisfactory range of expense ratios, that is only but one factor that contributes to Defendant's prudence or lack thereof. *Hughes*, 142 S. Ct. at 742 (remanding and noting that the lower court must "reevaluate the allegations as a whole" and "in context" by considering whether the plaintiffs "have plausibly alleged a violation of the duty of prudence as articulated in *Tibble*, applying the pleading standard discussed in [*Iqbal*] and [*Twombly*].").

Defendant asserts, for example, that Plaintiff "does not point to any alternative funds that were available to [Defendant]." (*Id.* at p. 25). To the contrary, Defendant ignores Plaintiff's ten examples of expensive share classes offered by the Plan during the Class Period compared to the highlighted, lower-cost share classes that were available for the same fund.[8] (Doc. 1, ¶ 64). It may very well be

---

[8]   Defendant again makes this argument when attempting to distinguish this case from the facts found in *Huang v. TriNet Grp., Inc., et al.*, No. 20-cv-2293, 2022 WL 93571 (M.D. Fla. Jan.

the case that Defendant has valid, meritorious reasons for opting to pursue the funds illustrated despite their higher fees in relation to their counterparts. Again, that is exactly why discovery is warranted here.

Defendant also alleges that Plaintiff improperly compares "the recordkeeping fees billed to ERAU Plan participants to average fees reported in the 401k Averages Book" because it assesses plans of differing sizes and payment structures together, which purportedly makes it "almost impossible to tell if these figures provide a meaningful benchmark." (Doc. 23, p. 27). Defendant's argument hinders rather than helps here: this lack of context is precisely why discovery is so necessary for this kind of claim. *Kruger*, 131 F. Supp. 3d at 479. In other words, Defendant may be correct—the Court requires the necessary information to determine as much.

The Court is more persuaded by Plaintiff's arguments. (Doc. 29). In opposition to Defendant's Motion, Plaintiff principally relies on *Huang v. TriNet Grp., Inc., et al.*, No. 20-cv-2293, 2022 WL 93571 (M.D. Fla. Jan. 10, 2022), which the Court finds instructive. (Doc. 29, p. 2). *Huang* concerned two allegedly imprudently managed "defined contribution" or "individual account" 401(k) plans governed under ERISA. 2022 WL 93571, at *1. The *Huang* plaintiffs raised substantially similar arguments to Plaintiff's arguments in this case. *Id.* at *1–2. Not only did the *Huang* court refuse to take judicial notice of almost all of the

_____

10, 2022), the case upon which Plaintiff relies in his opposition brief, which the Court also considers.

defendant's "voluminous" external evidence submitted to contravene the plaintiffs' assertions, but it also found, based on well-settled precedent, that plaintiffs had pled sufficient facts to meet the requisite pleading standard at the motion to dismiss phase. *Id.* at \*6.

In asking the Court to take judicial notice of the exhibits provided, Defendant argues that this case is distinguishable because the defendants there asked the court to take notice of substantially more records and because Plaintiff here did not present "alternative funds that the plans could have considered instead." (Doc. 41, p. 3). These arguments are unavailing. Even if the Court were to take judicial notice of Defendant's external exhibits, the Court would still find that Plaintiff has plausibly alleged that the recordkeeping fees were needlessly high and would require additional discovery to ascertain as much.[9] Plaintiff's claim would thus still survive Defendant's Motion. Second, Defendant is plainly incorrect that Plaintiff fails to offer proposed alternative funds that were virtually identical aside from their lower-expense ratios. (*See* Doc. 1, ¶ 64). Accordingly, this Court mirrors the *Huang* court in allowing Plaintiff's Complaint to survive because, like there, Plaintiff has plausibly alleged a breach of prudence, at minimum based on recordkeeping expenses and a failure to invest in virtually identical lower-cost share-classes. (*Id.* ¶¶ 64, 101). Defendant's Motion is thus denied as to Count I.

---

[9]   The Court keeps in mind the notion that the exercise of taking judicial notice is not one that the Court should engage in lightly but need not delve into the merits further because, as explained in the Order, the Court does not find that it would make a difference for purposes of ruling on the instant Motion. *Shahar*, 120 F.3d at 214.

## C.     Count II: Defendant's Failure to Adequately Monitor Other Fiduciaries as Service Providers

"A claim for the failure to monitor derives from and depends on an 'underlying breach of fiduciary duty cognizable under ERISA'"—that is, the duty of prudence. *Kendall v. Pharm. Prod. Dev., LLC*, No. 20-cv-71, 2021 WL 1231415, at *11 (E.D.N.C. Mar. 31, 2021) (quoting *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003)). The duty to monitor requires that plan fiduciaries "systematic[ally] conside[r] all the investments . . . at regular intervals to ensure that they are appropriate." *Tibble*, 575 U.S. at 529 (quoting A. Hess, G. Bogert, & G. Bogert, *Law of Trusts and Trustees* § 684, at 145–46 (3d ed. 2009)). In short, "a fiduciary is required to conduct a regular review of its investment"— the fiduciary cannot rely on fulfilling its "duty to exercise prudence in selecting investments at the outset." *Id.* at 528–29.

An appointing fiduciary—that is, a fiduciary who through their role in "appoint[ing] trustees or other fiduciaries" who actively manage ERISA plans—has a specialized duty to monitor that requires reviewing "[a]t reasonable intervals the performance of [the appointed] trustees and other fiduciaries . . . in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards[] and satisfies the needs of the plan." 29 C.F.R. § 2509.75-8, at FR-17; *see also Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465–66 (4th Cir. 1996). Thus, an appointing fiduciary's duty to monitor is no broader than the underlying duty of prudence claim. *Kendall*,

2021 WL 1231415, at *12 (internal quotation marks omitted) (quoting *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL 4358769, at *11 (S.D.N.Y. Sept. 29, 2017)).

Indeed, "the responsibility to monitor appointees" does not expose "the appointing fiduciary to open-ended liability." *Coyne*, 98 F.3d at 1466 n.10; *see also Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992) ("We reemphasize that a party is a fiduciary only as to the activities which bring the person within the definition."). Thus, courts have properly taken a restrictive view of the scope of this duty to monitor appointees and their plan-related activities. *See, e.g., Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991) (finding board members with power to appoint and remove plan fiduciaries not liable because nothing "put [them] on notice of possible misadventure by their appointees"). Nevertheless, where a plausible breach of the fiduciary duty of prudence is alleged against the appointees of appointing fiduciaries, courts have routinely found similarly plausible an attendant failure to monitor. *See e.g.*, *Kendall*, 2021 WL 1231415, at *12; *see also Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 137 (D. Mass. 2021) ("To the extent plaintiffs have plausibly alleged that defendants breached their fiduciary duties directly, plaintiffs have also plausibly alleged that defendants have breached their duty to monitor."). When the parties dispute the underlying claim upon which a failure to monitor claim is predicated, a trial court is within its discretion to keep both claims intact until a later juncture in the litigation. *See Tracey v. Massachusetts Inst. of Tech.*,

404 F. Supp. 3d 356, 364 (D. Mass. 2019) ("Thus, because the parties dispute the alleged underlying breach of fiduciary duty claims, plaintiffs' derivative claims that defendants breached their duty to monitor will also be preserved for trial.").

Defendant argues that Plaintiff's failure to monitor claim should fail because Plaintiff purportedly "has not alleged any facts challenging [Defendant's] failure to monitor any other person or entities responsible for administering the Plan." (Doc. 23, pp. 31–32). While Defendant's argument is well-taken, rather than dismiss at this phase, the Court invites Defendant to re-raise this objection at a later juncture if discovery reveals that the Plan was truly the only fiduciary implicated here. Because Plaintiff's claim is otherwise predicated on its breach of prudence claim, the Court declines to dismiss this cause of action at present. *Turner*, 530 F. Supp. 3d at 137.

### D.   Shotgun Pleading

Defendant argues that Plaintiff's Complaint should be dismissed as a shotgun pleading.

In *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015), the Eleventh Circuit outlined four types of "shotgun" complaints which require dismissal:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint . . . replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that

> commits the sin of not separating into a different count each cause of action or claim for relief.  Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id.* at 1321–23 (footnotes omitted). All four categories of "shotgun" complaints are deficient because "they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Id.* at 1323 (footnote omitted); *see also Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).

While Plaintiff technically employs the language that it "re-alleges and incorporates herein by reference all prior allegations" (Doc. 1, ¶¶ 110, 115) among other details found in the Complaint, the mere usage of such a phrase does not, in the Court's view, make it a shotgun pleading. (*Id.*). Plaintiff has otherwise put Defendant on notice of its claims as discussed above. Accordingly, the Court finds that it satisfies the test laid out by the *Weiland* court. 792 F.3d 1313.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion (Doc. 23) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on July 12, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties